**SO ORDERED.**

**SIGNED this 20 day of April, 2006.**

_____
J. Rich Leonard
United States Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE:

SOUTH BRUNSWICK WATER
& SEWER AUTHORITY,

    Debtor.                                                   Case No. 04-09053-8-JRL
                                                                                               Chapter 9

_____

**ORDER**

       This case is before the court on the debtor's "Amended Motion to Approve Settlement of Class Action Filed by Landowner/Plaintiffs and Motion to Approve Compromise of Remaining Claims" and the Committee for Unsecured Creditors' "Objection to Claim Filed by Special Class of Landowners/Taxpayers Per Class Action." On March 15-16, 2006, the court conducted a hearing on these matters in Wilmington, North Carolina.

       Under Bankruptcy Rule 9019, after notice and a hearing, the court may approve a compromise. *See* <u>In re Frye</u>, 216 B.R.166, 170 (Bankr. E.D.Va. 1997). In determining whether a proposed settlement should be approved, the court should make an informed, independent judgment as to whether a settlement is fair and equitable and in the best interest of the estate. *See* <u>Protective</u>

Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Official Comm. of Unsecured Creditors v. Venture (In re Bond), 16 F.3d 408, 1994 WL 20107 (4th Cir. 1994); In re Energy Cooperative, Inc., 886 F.2d 921 (7th Cir. 1989); In re Frye, 216 B.R. at 174.

In Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968), the Supreme Court instructed bankruptcy courts to "form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." The TMT case triggered various circuits to adopt a uniform standard for addressing a motion to approve compromise. *See* Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d. Cir. 1996); Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.), 898 F.2d 1544, 1549 (11th Cir. 1990), *cert. denied*, 498 U.S. 959 (1990); Martin v. Kane (In re A & C Properties), 784 F.2d 1377 (9th Cir. 1986), *cert. denied,* 479 U.S. 854 (1986); Drexel Burnham Lambert Inc. v. Flight Transp. Corp. (In re Flight Transp. Corp. Sec. Litig.), 730 F.2d 1128 (8th Cir. 1984), *cert. denied,* 469 U.S. 1207 (1985); American Can Co. v. Herpel (In re Jackson Brewing Co.), 624 F.2d 605, 607 (5th Cir. 1980).

While the Fourth Circuit has entered a couple of opinions regarding approval of compromises under Bankruptcy Rule 9019, it has not adopted a test employing definitive factors for consideration. In an unpublished opinion, the Fourth Circuit stated that compromises are favored in bankruptcy. Official Committee of Unsecured Creditors v. White Plains Joint Venture (In re Bond), No. 93-1410, 16 F.3d 408, 1994 WL 20107 *3 (4th Cir. 1994). The ultimate inquiry is whether the settlement is in the best interest of the estate, and central to that determination is a "comparison of the settlement's terms with the litigation's probable cost and benefits." Id.

Specifically, the Fourth Circuit set forth the following guidelines:

> The court must examine the terms of the proposed settlement, in light of the risks and rewards of not settling, and determine whether the proverbial bird in the hand is worth two in the bush. While this is not and cannot be the subject of a rigid, mathematical analysis, there must, nonetheless, be some type of correspondence between what is being given in connection with the compromise and what might be received if the dispute was prosecuted to its ultimate conclusion.

In re Bond, 16 F.3d at *4 (citing In re Krizmanich, 139 B.R. 456, 460 (Bankr. N.D. Ind. 1992)).

Courts within the Fourth Circuit have employed the following instructive test:

>  (1) Probability of success in litigation;
>  (2) The potential difficulties, if any, in collection;
>  (3) The complexity of the litigation involved and the expense, inconvenience
>  and delay necessarily attending it; and
>  (4) The paramount interest of the creditors.

In re Frye, 216 B.R. 166, 174 (Bankr. E.D.V.A. 1997); U.S. ex rel. Rahman v. Oncology Assoc., P.C., 269 B.R. 139, 149 (D. Md. 2001); In re Buchanan, No. 99-09817-W, 2000 WL 33710888 *3 (Bankr. D.S.C. 2000); *see also* Safeco Ins. Co. v. Yaeger (In re Magna Corp.), No. 01-80763C-7D, 2003 WL 22078082 *3 (Bankr. M.D.N.C. 2003)(employing a six-factor test). Under this four-part test, the movant has the burden of persuading the court that the compromise is fair and equitable and should be approved. In re Frye, 216 B.R. at 174. Employing this test is consistent with the guidelines set forth by the Fourth Circuit to consider the risks and rewards of settlement. In re Bond, 16 F.3d at *4. Having instructive factors to follow will enable the court to properly assess the class action settlement as well as the compromises of the remaining claims.

The court has reviewed the terms of the settlement of the class action lawsuit (Adversary Proceeding No. 06-00014-8-AP). In summary, the proposed settlement resolves all claims, known and unknown, and provides: (1) a cash settlement fund totaling $550,000.00, which consists of

$350,000.00 from South Brunswick Water and Sewer Authority ("SBWSA") and $200,000.00 from SBWSA's insurer, the Interlocal Risk Financing Fund of North Carolina ("IRFFNC"); (2) cancellation of all liens and judgments filed by SBWSA for the non-payment of levied fees and assessments; (3) forgiveness of all outstanding accounts receivables due and owing for the nonpayment of stormwater fees; (4) 30% of any net recovery from SBWSA's pending adversary proceeding against Ocean Isle Developing Co.; and (5) 30% of any net residual assets after all distributions under SBWSA's plan have been made. After payment of attorneys fees and expenses, funds shall be distributed on a pro rata basis to class members who have made payments for stormwater fees from 1995 to 2003. Funds that are not distributed to class members will be used to provide reduced fees to certain low-income families or handicapped individuals who may qualify in the SBWSA planning area. The Committee for Unsecured Creditors opposes this settlement. The court will consider the arguments of the Committee as it considers the settlement in light of the risk and rewards of litigation.

    First, the court considers the plaintiffs' probability of success in litigation. The plaintiffs contend that SBWSA assessed stormwater fees on property owners in its service area, but it never used the fees for statutorily authorized purposes under N.C. Gen. Stat. § 162A-9. In July 1998, SBWSA adopted a Phase I Plan and represented that certain action items would be taken during that five-year period. The plaintiffs contend that, when the five-year period had terminated, it was clear that SBWSA had not used the fees for permissible purposes. The plaintiffs argue that SBWSA neither provided a stormwater management program that protected water quality by controlling the level of pollutants or controlling the quantity and flow of stormwater, nor did it provide a stormwater drainage system. The plaintiffs assert that, despite SBWSA's failure to use the fees for

permissible purposes, SBSWA continued to collect fees and bring collection actions against the citizens of Brunswick County. The plaintiffs raise causes of action for negligence, breach of fiduciary relationship, misrepresentation, violation of the North Carolina Constitution, punitive damages as well as an action to quiet title to remove liens from class members' properties within the service area. At the hearing, the Committee for Unsecured Creditors argued that SBWSA had used the fees for permissible purposes; however, the evidence supported the plaintiffs' case

From 1994 to the end of its operation, SBWSA billed taxpayers/landowners in Brunswick County approximately $4,475,000.00 in stormwater fees. Dean Alan Walters, Chairman of the Board of Directors of SBWSA, said that no stormwater infrastructure had ever been put into place to control the level of pollutants, the quantity and flow of stormwater, or to provide a drainage system in the service area. It was his sentiments that SBWSA needed to stop charging the public for services that it was not providing. On April 20, 2003, the District Court of Brunswick County granted summary judgment in favor of the taxpayers/landowners who had been sued by SBWSA for failure to pay stormwater fees. Mr. Walters said that SBWSA did not appeal the decision because, at that point, it did not have the necessary income or the credibility to proceed with its operations.

Bradley Bennett, Supervisor of the Stormwater Unit of the North Carolina Division of Water Quality, explained the application process for SBWSA to obtain permits for operation. Mr. Bennett discussed the goals of the Phase I plan contained in the Final Environmental Impact Statement of July 1998 ("the Statement"). The Statement included a letter from the executive direct of SBWSA, which reads in part:

> Phase 1 Stormwater Master plan provides an outline of the recommended stormwater management policies and actions for the entire service area over the next five years. The document also provides immediate and specific recommended 'first steps' to correct many of the obvious water quality and quantity problems that plague the

southwestern area of Brunswick County.

Letter from Joseph A. Tombro, Executive Director, SBWSA to Readers (Jul. 8, 1998). Mr. Bennett agreed that what was contemplated in the Phase I five-year plan was to be completed before moving to Phase II. Action items for Phase I included water quality monitoring and sampling, a revision to the stormwater management ordinance, implementation of a local erosion and sediment control program, stormwater modeling, a maintenance program, a service rate study to assess charges and fees of the stormwater utility, a golf course cooperative environmental plan, the implementation of a regional BMP and riparian buffer programs, development of a drainage system inventory, acquisition of easements, use of a geographic information system, development of a pollution prevention program, public education, development of stormwater drainage system design criteria and standards, and the development of a capital improvement program. It was recommended that $450,000.00 a year be used toward these action items. Mr. Bennett was unaware of whether any Phase I action items, which would have provided stormwater infrastructure or maintenance personnel and equipment, had ever been completed. Moreover, he had no knowledge of how SBWSA had used the stormwater fees.

James Michael Chandler, who has provided auditing services to SBWSA since 2002, testified regarding how SBWSA spent its funds. Aside from its executive director, SBWSA only had four employees who exclusively performed administrative office work, including the filing of collection actions, the billing and posting of fees, and accounting services. Mr. Chandler stated that stormwater fees had been used for these administrative purposes and to pay for monitoring services provided by the University of North Carolina at Wilmington (UNCW). SBWSA also paid URS Greiner to perform engineering and surveying services and to prepare the necessary documentation

for the permit application process. Mr. Chandler clarified that SBWSA had not hired any personnel to perform work in the field for purposes of erecting stormwater infrastructure. The 2004 fiscal report states: "Although a substantial amount of planning, engineering and surveying has already been performed on the Water Quality Management Fund Capital Project, actual construction has not yet begun." South Brunswick Water and Sewer Authority, Financial Statement and Auditor's Report for Fiscal Year Ending June 30, 2004 at 11 (2004). Mr. Chandler said that SBWSA had created funds for specific purposes and that sometimes money would be transferred from one fund to another. Mr. Chandler was aware of a specific incident in 2002 where the Water Quality Management Fund had loaned money to the Package Plant Fund, which was a fund unrelated to stormwater. The money had not been repaid to the appropriate fund until after the 2002 auditing year.

     Lawrence B. Calhoun, a professor of marine biology, testified regarding the water quality monitoring services provided by UNCW to SBWSA from 1996 through 2003. Over the seven-year period, UNCW charged SBWSA approximately $1,000,000.00 for its services. Under the monitoring program, research assistants collected water samples approximately every three weeks from established monitoring locations within the SBWSA service area and then transported the water back to the university laboratory for analysis. The aim was to establish a baseline that showed the seasonal and storm event patterns in water quality, the range of variability in water quality parameters, and the identity of problem areas. Mr. Calhoun testified that, within a one-year period, UNCW had a baseline for use in the permit application process. UNCW provided its data to URS Greiner, the engineering consultant used by SBWSA. Greiner used UNCW's data for purposes of calculating pollutant loadings, for predicting the effects of certain courses of action, and for

preparing the statements and reports needed for the permitting process. GIS mapping and aerial photography was also provided, which pinpointed problem areas within the service area.

Professor Calhoun maintained a website that reported findings from the UNCW monitoring program. He attended monthly SBWSA board meetings, and he and his staff reported problem areas to SBWSA's executive director or to state authorities. However, Mr. Calhoun was unaware of SBWSA's hiring of maintenance staff to perform services and was unaware of any physical infrastructure that had been erected by SBWSA for controlling the level of pollutants, directing the quantity and flow of water, or serving as a drainage system.

In support of their claims, the plaintiffs refer to the case of Smith Chapel Baptist Church v. City of Durham, 350 N.C. 805, 517 S.E.2d 874 (1999). The case discusses the history of how Congress enacted the National Pollutant Discharge Elimination System (NPDES) but did not provide states with funding for comprehensive stormwater management programs. Id. at 808. In 1989, in an effort to support local municipal storm sewer systems, the North Carolina General Assembly ratified a bill authorizing local governments to construct and operate storm drainage systems as public enterprises and providing local governments with funding and taxing authority to finance the construction and operation of those systems. Id. (referring to Act of July 15, 1989, 1989 N.C. Sess. Laws 643). As part of the Act, the General Assembly defined public enterprise to include "structural and natural stormwater and drainage systems of all types." Id. (quoting N.C. Gen. Stat. § 160A-311 (1994)).

In the Smith Chapel case, the City of Durham adopted an ordinance, which created a stormwater utility to finance a stormwater management plan and to impose utility fees on property owners. Id. at 809. A number of churches challenged the ordinance and utility fees, asserting that

the ordinance exceeded the city's enabling authority, pursuant to §§ 160A-311 and 160A-314, that it violated the express limitation on stormwater fees, pursuant to § 160A-314(a1), and that it provided for utility fees that did not correspond to services provided. Id. at 809. The trial court found that the ordinance and utility fees were invalid, as they exceeded the city's authority granted by statute. Id. The trial court held that the churches were entitled to a full refund, plus interest, on those fees paid to the date of the judgment. Id. The Supreme Court of North Carolina affirmed the ruling of the trial court, including the refund to the churches based upon equitable principles of unjust enrichment. Id. at 818. In arriving at its decision that the city had exceeded its authority, the Supreme Court of North Carolina analyzed the plain language of §§ 160A-314(a1) and 160A-311 as well as the title of the act that added the statutory provisions regarding stormwater. Id. at 811-812. It compared the statutory language with the language of the city ordinance and applicable documents describing the stormwater program. Id. at 812-814. The court concluded that "little of the program's emphasis [was] on the maintenance and construction of a structural and natural stormwater and drainage system;" rather, "[t]he program instead focus[ed] on educational programs, guidance manuals, used oil recycling, household hazardous waste collection, and enforcement efforts against illegal dumping of hazardous materials." Id. at 814-815.

The Committee for Unsecured Creditors asserted that the decision in Smith Chapel no longer carried weight because the General Assembly had amended the applicable statutes retroactively to expand the purposes for which fees may be imposed and used by cities, towns, and authorities that operate stormwater programs. The Committee asserts that, based upon the applicable amendments, SBWSA did not exceed its statutory authority.

Despite the 2000 amendments, Smith Chapel remains instructive regarding the analysis a

court should undertake in reviewing whether a government unit has exceeded it statutory authority and the adequate remedies afforded to the public when the grant of authority is exceeded. Smith Chapel instructs the court to consider the title of the act in ascertaining the intent of the legislature. Smith Chapel, 350 N.C. at 812. In 2000, the General Assembly ratified the bill, titled "An Act to Clarify That Stormwater Utility Fees May Be Used To Fund All Costs of Stormwater Management Programs, As Recommended by the Environmental Review Commission." Act of June 30, 2000, 2000 N.C. Sess. Laws 70. It is clear from reading the title of the act that the new law was intended to broaden the scope of permissible costs to include all costs of stormwater management programs.

The court considers the plain language of the statutes. Smith Chapel, 350 N.C. at 811. Amended § 162A-9, which is applicable to an authority like SBWSA, is effective retroactively to July 8, 1991 and applies to the period of time SBWSA was assessing and using fees in its service area. N.C. Gen. Stat. § 162A-9, Act of June 30, 2000, 2000 N.C. Sess. Laws 70. Section 162A-9 enables an authority to establish rates, fees, and charges for the "services furnished or to be furnished by any water system . . . ." N.C. Gen. Stat. 162A-9(a). A water system includes "stormwater management programs designed to protect water quality by controlling the level of pollutants in, and the quality and flow of, stormwater and structural and natural stormwater and drainage systems of all types . . . ." N.C. Gen. Stat. § 162A-2(12); Act of June 30, 2000, 2000 N.C. Sess. Laws 70 (stating that the amendments to § 162A-2(12) are effective retroactively to July 8, 1991). Section 162A-9 clarifies that any necessary costs for the management of stormwater quality and quantity are authorized and states, in pertinent part:

> Rates, fees, and charges imposed under this subsection for stormwater management programs and stormwater and drainage system service may not exceed the authority's cost of providing a stormwater management program and a structural and natural stormwater and drainage system. **The authority's cost of providing a**

> **stormwater management program and a structural and natural stormwater and drainage system includes any costs necessary to assure that all aspects of stormwater quality and quantity are managed in accordance with federal and State laws, regulations, and rules**.

N.C. Gen. Stat. § 162A-9 (emphasis added). Based on the evidence presented to the court, SBWSA did not use stormwater fees for statutorily authorized purposes; rather, it used the fees for administrative billing and enforcement purposes, for water monitoring, for GIS mapping and aerial photography, and for planning and reporting activities associated with the permit application process. While these activities were not illegal, they did no fall within the scope of § 162A-9 and should have been funded by other sources. To protect against possible abuses of the authority under § 162A-9, the General Assembly directs an authority to hold funds received pursuant to statutory authority in trust to be applied only for statutorily authorized purposes. N.C. Gen. Stat. § 162A-11 (stating "[a]ll moneys received pursuant to the authority of this Article shall be deemed to be trust funds, to be held and applied solely as provided in this Article."). Thus, SBWSA had a duty to hold the money in trust and use it for purposes authorized under § 162A-9. The evidence presented at the hearing supports that SBWSA failed to honor that statutory duty. The court has considered the defendants' strongest potential defenses, such as the statute of limitations and government immunity, and finds that the plaintiffs would have a high probability of succeeding if this case went to trial.

Second, the court considers the potential difficulties, if any, in collection. SBWSA is no longer in operation and holds a finite pool of money. When this Chapter 9 case was filed, SBWSA had approximately $998,000.00 in its account. As of the subject hearing, only $668,000.00 remained in the account due to the payment of professional fees. Dean Cunningham of the Local Government Commission estimated that 35% of those professional fees were directly related to the class action lawsuit. Clearly, SBWSA would not have sufficient funds to cover a judgment in favor of the

11

plaintiffs. SBWSA concedes that the plaintiffs could possibly obtain an adverse judgment in excess of $5,250,000.00. The IRFFNC denied any coverage of plaintiffs' claims.

Third, the court considers the complexity of the litigation involved and the expense, inconvenience, and delay accompanying it. The parties reached the proposed settlement during the early stages of litigation and before any answer was filed in the case. The parties were realistic regarding the lack of funds in the bankruptcy estate to satisfy the ultimate judgment on the merits. It is anticipated that, if the class action proceeded to trial, the parties would have engaged in a lengthy and expensive discovery process. According to Mr. Cunningham, SBWSA possesses approximately 10,000 to 12,000 records in Brunswick County and Wake County, and approximately 6, 000 to 7,000 of those records pertain to the subject lawsuit. Moreover, with approximately 15 to 20 different directors serving on SBWSA's board over the years, the parties may have been plagued by a mountain of depositions. After discovery, hearings on motions, and trial, SBWSA's limited funds would have been ravaged by administrative expenses.

Finally, the court considers the paramount interest of creditors. Notice was provided to the taxpayers/landowners regarding the proposed settlement of the class action lawsuit. Counsel received one inquiry regarding the settlement but no objections. The Committee for Unsecured Creditors opposes the settlement of the class action lawsuit. It argues that the plaintiffs' case lacks merit; however, the evidence presented at the hearing actually supports the plaintiffs' case that SBWSA failed to use the stormwater fees for statutorily authorized purposes. Even in light of potential defenses to their claims, the plaintiffs would likely succeed if the case went to trial.

The Committee further argues that there is no justifiable reason for granting the plaintiffs a distribution in a fixed amount. In reaching a settlement, the class action plaintiffs required that a set

amount be agreed upon so that the court could judge the fairness and adequacy of the settlement under Rule 23(e) of the Federal Rules of Civil Procedure. By reaching a fixed settlement amount, SBWSA was able to negotiate a $200,000.00 contribution from its insurer.

The Committee asserts that the general unsecured creditors will receive less than the landowners/taxpayers if a plan incorporating the settlement is approved. After arriving at the terms of the settlement and receiving opposition from the Committee, the parties obtained the opinion of an experienced bankruptcy attorney regarding the proposed settlement. Richard M. Hutson, II, is a North Carolina Board Specialist in Bankruptcy who has practiced law in North Carolina for 41 years, has served in the capacity of trustee, and has served as counsel for business debtors, creditors, and creditors' committees. The court deemed Mr. Hutson an expert in the area of prudence and practicality of settlements. After reviewing the materials provided by the parties and Committee as well as conducting his own research, Mr. Hutson concluded that the settlement was fair and reasonable. Based on the class claim of $5,250,000.00, the proposed settlement would provide the class members with a 7% recovery while the general unsecured creditors would receive a 9% recovery. Mr. Hutson considered distributions under various scenarios and determined that the proposed settlement was favorable to all creditors. The court found Mr. Hutson's testimony and exhibits to be compelling regarding the fairness of the settlement.

The Committee argues that the plaintiffs have provided insufficient proof of how they arrived at damages of $5,250,000.00 or more. It suggests that, in lieu of accepting this settlement, the court should conduct an estimation hearing, pursuant to 11 U.S.C. § 502(c) in order to arrive at a fair

number for confirmation of the plan and for distribution.[1] Mr. Hutson suggested that an estimation hearing might take three to four days depending on the amount of witnesses. The expenses associated with an estimation hearing would lead to further administrative expenses in the case and considerably deplete the already dwindling pool of funds.

Even though § 502(c), which authorizes the court to estimate a contingent or unliquidated claim, is applicable to Chapter 9 cases, the court cannot force SBWSA to remain in Chapter 9. At the beginning of the hearing, SBWSA raised the possibility of dismissing this action if the settlement was not approved and then seeking remand and approval in the Superior Court of Brunswick County. The court holds limited jurisdiction and power over a Chapter 9 debtor. 11 U.S.C. § 904. The court must balance its discretion to approve a settlement under Rule 9019 with its curtailed role in a Chapter 9 case, as the court may not "interfere with: (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or enjoyment of any income-producing property." 11 U.S.C. § 904. Prior to confirmation and absent a waiver of its autonomy rights under § 904, a Chapter 9 debtor may request dismissal of its case without the necessity of an evidentiary showing that dismissal would be in the best interest of creditors. In re Richmond Unified School District, 133 B.R. 221, 224 (Bankr. N.D. Cal. 1991). A request for dismissal is "cause" for dismissal. Id. If the court disallows the settlement and the debtor dismisses this case, then the general unsecured creditors must race to the state courthouse and the administrative claimants in this court will likely go unpaid. The court has reviewed the terms of the settlement as well as the proposed treatment of general unsecured creditors in this case. The court

---

[1] Although the court has not conducted a full evidentiary hearing to estimate the claim, based on the evidence reviewed this far, it seems likely that the court would estimate the claim as agreed in the settlement.

finds that the settlement of the class action lawsuit is fair and reasonable.

After weighing factors for consideration under Bankruptcy Rule 9019, the court approves the settlement of the class action lawsuit. To further clarify the record in this case, the court reiterates the remaining compromises as follows:

| Creditors | Original Claim | Final Allowed Claim |
|---|---|---|
| Arcadis | $2,375,151.00 | $1,650,000.00 |
| Arcadis | $30,730.00 | (included in final allowed claim above) |
| UNCW | $474,664.90 | $350,000.00 |
| Jennings Edge | $8,575.00 | $6,860.00 |
| George Knott | $12,850.00 | $10,280.00 |
| Russell Price | $12,049.00 | $9,640.00 |
| Raftelis | $188,782.01 | $125,000.00 |
| Joseph Tombro | $1,030,872.56 | $100,000.00 |
| G. Eric William | $2,833.00 | $2,800.00 |

The court, considering factors under Bankruptcy Rule 9019, approves the compromises of these claims. Based on the foregoing, the court grants the debtor's "Amended Motion to Approve Settlement of Class Action Filed by Landowner/Plaintiffs and Motion to Approve Compromise of Remaining Claims."

"END OF DOCUMENT"